IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| WILLIAM A. RUTHERFORD, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. No.: _____ |
| v. | ) | Judge: _____ |
| | ) | |
| CAMPBELL COUNTY, TENNESSEE, and | ) | |
| BOARD OF COMMISSIONERS OF | ) | **JURY DEMAND** |
| CAMPBELL COUNTY, TENNESSEE, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW, the Plaintiff, WILLIAM A. RUTHERFORD, JR., by and through counsel, hereby files this Complaint for violations of the United States Constitution and Tennessee common and statutory law against the Defendants, CAMPBELL COUNTY, TENNESSEE, and BOARD OF COMMISSIONERS OF CAMPBELL COUNTY, TENNESSEE, and for cause of action would show unto the Honorable Court as follows:

### PARTIES

1.      Plaintiff, William A. Rutherford, Jr., is a resident and citizen of LaFollette, Campbell County, Tennessee.

2.      Defendant, Campbell County, Tennessee, is a political subdivision of the State of Tennessee and may be served with process by and through the County Mayor, Jack Lynch, at 570 Main Street, Jacksboro, TN 37757, or the County Attorney, Joseph G. Coker, 160 Valley Street, Jacksboro, TN 37757.

3.      Defendant, the Board of Commissioners of Campbell County, Tennessee

(hereinafter "Board of Commissioners") is the legislative body for Campbell County, Tennessee, and is comprised of 15 members representing five districts in Campbell County, and may be served with process by and through the Chairman of the Board of Commissioners, Johnny Bruce, 570 Main Street, Jacksboro, TN 37757, and County Mayor, Jack Lynch, at 570 Main Street, Jacksboro, TN 37757.

## JURISDICTION AND VENUE

4.     This action is brought to redress alleged deprivations of constitutional rights as protected by 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the United States Constitution, as well as 29 U.S.C. § 2601, *et seq*. Original jurisdiction is founded in 28 U.S.C. §§ 1331 and 1343.

5.     Pursuant to 28 U.S.C. § 1367(a), the Court also has supplemental jurisdiction over all claims brought under Tennessee law.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

7.     At all times material hereto, Defendants were subject to the provisions of 42 U.S.C. § 1983.

8.     At all times material hereto, Defendants, its agents and employees, including Plaintiff, were subject to the protections of the First Amendment of the Constitution of the United States of America.

9.     At all times material hereto, Defendants were an employer subject to the provisions of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

10.     At all times material hereto, Defendants were a "public employer" within the meaning of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-601,

*et seq.*

11. At all times material hereto, the Board of Commissioners were public officials under Tennessee law.

12. At all times material hereto, the Board of Commissioners were elected by the citizens of Campbell County, Tennessee.

13. At all times material hereto, the members of Board of Commissioners were each an "elected public official" within the meaning of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-601, *et seq.*

14. At all times material hereto, Plaintiff was a "public employee" within the meaning of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-601, *et seq.*

15. At all times material hereto, Defendants were an employer subject to the provisions of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* (hereinafter "FMLA").

16. At all times material hereto, Defendants were an employer engaging in an industry affecting commerce and collectively employed more than one hundred (100) employees in the State of Tennessee.

17. At all times material hereto, the Board of Commissioners were agents and/or employees of Defendant Campbell County, TN.

18. At all times material hereto, the Board of Commissioners had final policy-making authority over the Defendants.

19. At all times material hereto, the Board of Commissioners were the legislative body for Defendants, comprising of 15 members that represent five districts within Campbell County, TN, and each serving four-year terms.

20. At all times material hereto, Defendants, its agents and employees, were a "public

servant" within the meaning of the Tennessee statute for Misconduct Involving Public Officials and Employees, Tenn. Code Ann. § 39-16-401, *et seq*.

21.    As set forth herein, during his employment, the Plaintiff engaged in and intended to continue to engage in constitutionally and legally protected activity by speaking or engaging in speech on matters of great public concern and by reporting, opposing, and refusing to remain silent about or participate in the illegal activities of agents and/or employees of Defendants in violation of Tennessee law, including, but not limited to, the following statutes, among other laws, regulations, and ordinances, to-wit:

- Official Misconduct, Tenn. Code Ann. § 39-16-402.

- Official Oppression, Tenn. Code Ann. § 39-16-403.

- Tennessee Solid Waste Disposal Act, Tenn. Code Ann. § 68-211-101, *et seq*.

- Solid Waste Management Act, Tenn. Code Ann. § 68-211-801, *et seq*.

- Solid Waste Processing and Disposal, Tenn. Rules & Regs. Chapter 0400-11-01, *et seq*.

- Criminal Offenses Against Property, Litter Control, Tenn. Code Ann. § 39-14-501, *et seq*.

- Theft of Services, Tenn. Code Ann. § 39-14-104.

- Offenses by Supervisors and Employees, Tenn. Code Ann. § 39-16-410.

22.    The Tennessee statutes set forth in Paragraph 21 are intended to protect the public health, safety, and welfare.

23.    The Tennessee statutes set forth in Paragraph 21 reflect clear and unambiguous statements of public policy.

24.    The Tennessee statutes set forth in Paragraph 21 can subject the Defendants, its agents and employees to civil and/or criminal penalties and fines.

25.    Conduct in violation of the Tennessee statutes set forth in Paragraph 21 are matters

of public concern.

26. Conduct in violation of the Tennessee statutes set forth in Paragraph 21 constitute "illegal activities" as defined in Tenn. Code Ann. § 50-1-304.

27. The Tennessee Department of Environment and Conservation (hereinafter "TDEC") is a cabinet-level agency of the State of Tennessee.

28. At all times material hereto, Defendants owned and operated the Campbell County Transfer Station, permitted as a Transfer Station under TDEC Permit No. TRF070001134, located at 745 Towe String Road, Jacksboro, TN (hereinafter "Transfer Station") which was permitted to accept both residential and commercial forms of waste, recycling, and other materials.

29. At all times material hereto, Defendants also owned and operated the following waste and recycling centers (hereinafter "Convenience Centers"), throughout Campbell County, TN, including:

| **Facility** | **TDEC Permit Number** | **Location** | **City** | **County** |
|---|---|---|---|---|
| Towe String Road Convenience Center | CCC070000123 | 745 Towe String Road | Jacksboro | Campbell |
| Powell Valley Convenience Center (Well Springs) | CCC070000207 | Old Highway 63 East | LaFollette | Campbell |
| Stinking Creek Road Convenience Center | CCC070000387 | Stinking Creek Road | Pioneer | Campbell |
| Elk Valley Convenience Center | CCC070000541 | 6783 Highway 297 | Pioneer | Campbell |
| Vasper Convenience Center | CCC070000543 | 126 Old Vasper Lane | Caryville | Campbell |
| White Oak Convenience Center | CCC070000544 | 3750 Davis Creek Road | Duff | Campbell |
| College Hill Convenience Center | CCC070000545 | 702 Demory Road | LaFollette | Campbell |
| Oswego Convenience Center | CCC070000546 | 546 Wollridge Pike | Jellico | Campbell |
| Peabody Convenience Center | CCC070000547 | 3934 S. Hwy 25 | LaFollette | Campbell |

30. At all times material hereto, Tennessee law and Defendants' TDEC Permits for the

above-referenced Convenience Centers permitted the acceptance of only residential household waste and recyclables.

31.     At all times material hereto, Tennessee law and Defendants' TDEC Permits for the above-referenced Convenience Centers prohibited the acceptance of commercial waste.

32.     At all times material hereto, Tennessee law and Defendants' TDEC Permits permitted only Campbell County residents to dump waste and recyclables at Defendants' waste facilities.

33.     At all times material hereto, Tennessee law and Defendants' TDEC Permits prohibited commercial haulers from dumping waste and recyclables at the Convenience Centers.

34.     At all times material hereto, it was a violation of Tennessee law and Defendants' TDEC Permits for the Convenience Centers to accept commercial waste.

35.     At all times material hereto, a violation of the TDEC Permits for the above-referenced Transfer Station and Convenience Centers is, in turn, also a violation of Tennessee law and regulations.

36.     At all times material hereto, Defendants are required to comply with the TDEC Permits in order to lawfully operate the above-referenced Transfer Station and Convenience Centers.

37.     Violations of the TDEC Permits could subject Defendants' agents and employees, including Plaintiff, to civil penalties and/or damages as well as criminal offenses pursuant to Tennessee law, including Tenn. Code Ann. § 68-211-114 and § 68-211-117.

38.     On December 17, 2018, Plaintiff was hired as the Sanitation Director (otherwise known as "Environmental Services Director") by Defendants by the vote of the Campbell County Board of Commissioners.

39.     At all times material hereto, Plaintiff was qualified for the position of Sanitation Director.

40.     During his employment, Plaintiff earned numerous merit raises.

41.     During his employment, Plaintiff performed his job duties in a competent and satisfactory manner.

42.     During his employment, Plaintiff received numerous positive evaluations, commendations, and awards.

43.     In fact, in July 2019, Plaintiff received an award from the East Tennessee District Developmental for the Transfer Station being the "Most Improved" and "Most Upgrades" in east Tennessee.

44.     On June 17, 2019, due to an ongoing power struggle between the County Mayor at that time and the Board of Commissioners with respect to the operation and funding of the Sanitation Department, the Board of Commissioners voted in part "to remove the hiring, termination and supervision of the Director of Environmental Services & Sanitation from the control of the County Mayor and place the hiring, termination and supervision of the Director of Environmental Services & Sanitation under the control of the County Commission" and, further, Plaintiff's position of Director of Environmental Services and Sanitation, among others, are to be "selected, hired, supervised, and terminated solely within the authority and discretion of the Campbell County legislative body."

45.     As a result of this change, Plaintiff went from reporting to and being supervised by one supervisor, the County Mayor, to effectively reporting to and being supervised by 15 different supervisors, the Board of Commissioners.

46.     After the Board of Commissioners took control over the Sanitation Department,

several of the individual Commissioners, their constituents, friends, and/or relatives, began utilizing the Sanitation Department's waste facilities, including the Transfer Station and Convenience Centers, for personal, professional, and/or political gain, to the point that certain Commissioners were increasingly abusing the scope and authority of their elected positions resulting numerous violations of Tennessee law related to illegal dumping, storage, and acceptance of waste, particularly commercial waste, among other illegal activities.

47.     As a result, Plaintiff complained about, and refused to participate in and/or remain silent about the illegal activities he observed during his employment, and this resulted in Plaintiff being retaliated against and ultimately wrongfully discharged as hereinafter alleged.

48.     In early 2021, Plaintiff reported to the Board of Commissioners that certain haulers of commercial waste, including the nephew of Commissioner Scotty Kitts, was refusing to register with Defendants as a commercial hauler resulting in Kitts' nephew not having to pay the required fees for dumping commercial waste in violation of Defendants' own resolution, and Plaintiff also reported that this commercial waste was being dumped illegally at Defendants' Convenience Centers which are not allowed to accept commercial waste under Tennessee law due to Defendants' TDEC Permits for the Convenience Centers only allowing the dumping of soft bagged household generated waste.

49.     As a result of Plaintiff's reports, certain Commissioners began to take steps to retaliate against Plaintiff by searching for reason(s) to discipline him for trumped up reasons.

50.     On June 11, 2021, Plaintiff emailed the County Attorney, Joe Coker, and copied thereto all 15 of the Board of Commissioners, to report that Commissioner Kitts showed up unannounced at the Sanitation Department office to inform personnel that "things were going to change" as he proceeded to inspect the facility and speak with employees, and even instructed one

employee to drive him around the property in one of Defendants' service trucks. Plaintiff also advised Attorney Coker that he called Commissioner Kitts to ask him why he showed up at the facility, to which Kitts stated that he "was not there to write up" Plaintiff, but was compiling a "list of discrepancies that he wanted [Plaintiff] to fix." (Plaintiff's Email to Joe Coker, dated June 11, 2021 (Jacksboro-Open-Records295), attached hereto as Exhibit 1).

51.     Plaintiff's email to the County Attorney, Joe Coker (Exh. 1), reported Commissioner Kitts' clear violations of the Tennessee Sunshine Act, Tenn. Code Ann. § 8-44-101, *et seq*.

52.     However, County Attorney, Joe Coker, never responded to Plaintiff's email dated June 11, 2021. (Exh. 1).

53.     At all times material hereto, Commissioner Scotty Kitts was also a municipal employee of the City of LaFollette, TN.

54.     As a result, Commissioner Scotty Kitts was adamantly against Defendants charging the municipalities, like the City of LaFollette, for disposing of waste at Defendants' waste facilities.

55.     Shortly thereafter, on July 19, 2021, at the motion of Commissioner Ralph Davis and seconded by Commissioner Scotty Kitts, the Board of Commissioners voted to approve a list of "proposals for the Sanitation Department" to be completed within a certain timeframe, but several of the "proposals" included items completely unrelated to the Sanitation Department, such as building a road for the Animal Shelter, and Plaintiff was further instructed to complete the list of "proposals" by utilizing funds originally appropriated for the Sanitation Department.

56.     Beginning in early 2022, up through the date of Plaintiff's termination, the Board of Commissioners on the Sanitation Committee became increasingly hostile and retaliatory, due to the Plaintiff's refusal to ignore blatant violations of the laws and regulations that Defendants

were required to follow pursuant to the TDEC Permits, especially as related to commercial waste.

57. By way of further background, before Plaintiff was hired as Sanitation Director, the Defendants passed a resolution requiring a specific sticker ("wheel tax sticker") that was to be placed on the back of the license plates of Campbell County residents, and this sticker was supposed to be required in order to dump waste at Defendants' waste facilities because Tennessee law and Defendants' TDEC Permits prohibited non-Campbell County residents and unregistered commercial haulers from dumping at Defendants' waste facilities.

58. The taxes generated from the wheel tax sticker were used to assist with funding the Defendants' waste facilities.

59. However, in January or early February 2022, Plaintiff and the Sanitation Department discovered that the wheel tax sticker was not being enforced, and that non-Campbell County residents as well as certain commercial haulers that were not registered to pay the required dumping fees were in fact dumping waste at Defendants' facilities in violation of Tennessee law and Defendants' TDEC Permits.

60. At Plaintiff's instruction, in the attempt to enforce Tennessee law and Defendants' TDEC Permits, the Sanitation Department began enforcing the wheel tax sticker by requiring every person who attempted to dump waste at one of Defendants' waste facilities to show proof of this sticker, and, if not, then the person was not allowed to dump waste and this also resulted in the certain commercial haulers not registered with the County, including the nephew of Commissioner Scotty Kitts, from being prohibited from dumping at Defendants' waste facilities.

61. However, after the Sanitation Department began enforcing this wheel tax sticker, the Board of Commissioners began receiving complaints from constituents about being prohibited from dumping waste, particularly commercial haulers.

62.     As a result, within a few days of the Sanitation Department enforcing the wheel tax sticker in early 2022, Commissioner Scott Stanfield called Plaintiff to inform him that "too many voters are calling in to complain" to the Commissioners about not being allowed to dump at Defendants' waste facilities, and Plaintiff was therefore instructed to stop enforcing the wheel tax sticker as a requirement to dump waste.

63.     As a result of Defendants choosing to not enforce the wheel tax sticker, Campbell County taxpayers were effectively paying hundreds of thousands of dollars for non-residents and unregistered commercial haulers to dump waste at Defendants' waste facilities.

64.     Shortly thereafter, at the Sanitation Committee meeting on February 7, 2022, the Board of Commissioners formally voted, in part, to "allow use of the convenience center with proof of citizenship or property ownership: proof may include; Campbell County driver's license, property tax receipt, Campbell county tag sticker. *Wheel tax sticker is not mandatory." (Minutes for Sanitation Committee meeting dated February 7, 2022 (Jacksboro-Open-Records0517-519), attached hereto as Exhibit 2).

65.     By formally making the wheel tax sticker no longer mandatory, the Board of Commissioners further opened the door for any person to dump at Defendants' waste facilities in violation of Tennessee law and Defendants' TDEC Permits, all of which increased the amount of waste received at intake.

66.     At the Sanitation Committee meeting on February 7, 2022, the Board of Commissioners also all voted in favor to "only weigh materials that the county will collect a fee for" at the Convenience Centers, despite the Plaintiff's noted objection that bypassing the scales raised "concerns about monitoring intake [of waste], and recording accurate numbers." (Exh. 2).

67.     The decision to only weigh fee generating material as recommended by the

Sanitation Committee was thereafter approved by the vote of the Board of Commissioners on February 22, 2022.

68.　　Thereafter, as Plaintiff predicted during the meeting on February 7, 2022, the decision to only weigh the fee generating material ultimately did cause issues because the Sanitation Department could not effectively monitor the intake of waste and accurately record the amount of waste dumped at Defendants' waste facilities.

69.　　In June 2022, Commissioner Dewayne Baird attempted to dump commercial waste at the Transfer Station without paying the required fees, but Plaintiff refused to allow Baird to dump this waste for free. Later that same day, Plaintiff complained about this to Commissioners, Ralph Davis and Rusty Orick.

70.　　In June 2022, while Plaintiff was on vacation, he received a call from the owner of a local tire vendor who requested to dispose of over 700 commercial tires at the Transfer Station, but Plaintiff rejected this request because there was not enough room at the facility to legally dispose of that many tires.

71.　　The owner of a local tire vendor then contacted Commissioner Ralph Davis, and Davis overruled Plaintiff and authorized the owner to dispose of the 700+ commercial tires by illegally dumping the tires at the top of the hill above the Transfer Station.

72.　　Dumping the 700+ commercial tires at the top of the hill above the Transfer Station was in violation of Tennessee law and Defendants' TDEC Permit, including but not limited to, Tennessee Solid Waste Management Act, Tenn. Code Ann. § 68-211-801, *et seq*.

73.　　Within about a week of the 700+ commercial tires being illegally dumped at the Transfer Station, Commissioner Ralph Davis then contacted a local newspaper to report that the tires were in fact illegally dumped to slander Plaintiff in the eyes of the public, and damage his

character and reputation in overseeing the Sanitation Department.

74.     At the following Sanitation Committee meeting on July 6, 2022, Plaintiff complained about Commissioner Ralph Davis causing 700+ commercial tires to be illegally dumped at the Transfer Station due to this being in violation of Tennessee law.

75.     During the Sanitation Committee meeting on July 6, 2022, Plaintiff complained about Defendants' handling of the disposal of commercial tires at the waste facilities, including that disposed tires were moved indoors at the Transfer Station to prevent the public from illegally dumping tires at the top of the hill, and Plaintiff also tried to explain that "the law does not state that county sanitation has to take commercial tires," that the State of Tennessee "has recognized an epidemic surrounding tires across Tennessee," and he urged the County to stop accepting commercial tires, and that commercial haulers only bring tires to Defendants' waste facilities "because we are cheaper" compared to other disposal methods. (Minutes for Sanitation Committee meeting dated July 6, 2022 (Jacksboro-Open-Records523-527), attached hereto as Exhibit 3).

76.     However, Plaintiff's objections to Defendants' acceptance of commercial tires were overruled by the Board of Commissioners because several Commissioners on the Sanitation Committee, including those at the July 6, 2022 meeting, had personal, financial, and/or political interests in ensuring commercial tires were accepted, and in fact, even Defendants' Mayor spoke up during the meeting to opine only that he "fully supports accepting tires." (Minutes for Sanitation Committee meeting dated July 6, 2022, at Exh. 3).,

77.     In fact, since at least 2017, forward, Commissioner Scotty Kitts' brother's company had the exclusive contract to remove all tires from Defendants' waste facilities and was paid based on the total of weight of the removed tires.

78.     As a result, it benefited certain Commissioners like Scotty Kitts (or, his family) for

Defendants' waste facilities to accept any and all commercial tires regardless of whether the facilities had enough storage for the tires and/or that the tires were legally dumped or not.

79.     During the July 6, 2022 Sanitation Committee meeting, Commissioner Ralph Davis admitted that the "decision to put the overflow tires on top of the hill was his" with respect to Davis instructing the local vendor to illegally dump the 700+ commercial tires in mid-June 2022. (Minutes for Sanitation Committee dated July 6, 2022, at Exh. 3).

80.     However, despite this admission of illegally dumping commercial tires, Commissioner Davis then "proposed a motion to approve the corrective action plan created for sanitation" which comprised of a list of 12 action items that "need to be completed within the next 30 days." (Minutes for Sanitation Committee dated July 6, 2022, at Exh. 3).

81.     The list of 12 items on the corrective action plan included: 1. All trucks and/or equipment must be repaired and operable. 2. Stowers front end loader rental situation be settled. 3. Scrap metal to be removed from the premises. 4. Finish the office. 5. Address and correct employees leaving keys in the compactors. 6. Educate employees on public relations. 7. Clearly and visibly label the recycling cans. 8. Obtain a quote and repair the hole in the roof in current office. 9. Remove the tires from the building's exterior. 10. Clean up all debris and litter from premises. 11. Complete installation for the remaining compactors. 12. Notice of leave should be sent to the office of the county commission for approval <u>PRIOR</u> to going to the finance department. (Minutes for Sanitation Committee dated July 6, 2022, at Exh. 3).

82.     After discussing the proposed corrective action plan for the Sanitation Department during the July 6, 2022 meeting, Commissioner Ralph Davis then asked for the other members of the Sanitation Committee "to approve the written reprimand and the corrective action plan" but no motion was made in support of Commissioner Davis' proposal because there was no legitimate

reason to discipline Plaintiff, and, as a result, the meeting adjourned. (Minutes for Sanitation Committee dated July 6, 2022, at Exh. 3).

83.     However, Commissioner Ralph Davis persisted with his attempts to issue Plaintiff a retaliatory discipline due to Plaintiff's prior complaints about and refusal to go along with the illegal activities stated herein, including the illegally dumped tires at the Transfer Station.

84.     The proposed list of 12 items on the corrective action plan proposed during the July 6, 2022 Sanitation Committee meeting was created by and/or with the approval of Commissioner Ralph Davis.

85.     Commissioner Ralph Davis proposed the list of the 12 action items to retaliate against Plaintiff due to his persistent complaints about, and refusal to participate in, the illegal activities as described and set forth herein.

86.     A few days later, on July 8, 2022, certain Board of Commissioners, including Ralph Davis, Charles Baird, and Chairman Johnny Bruce, made an unannounced visit to the Sanitation Department, where Davis abruptly informed Plaintiff that he was "going to write you up" and that this was going to be "in secret" so that no one else would know about the write up.

87.     Discussing the decision to discipline Plaintiff outside the purview of the public eye, was in violation of the Tennessee Sunshine Act, Tenn. Code Ann. § 8-44-101, *et seq*.

88.     Because Commissioner Ralph Davis could not get the formal approval from the other members of the Sanitation Committee to issue Plaintiff the retaliatory discipline, Davis decided to take matters into his own hands by unilaterally issuing discipline to the Plaintiff.

89.     On July 15, 2022, Commissioner Ralph Davis sent a letter to Plaintiff, dated July 15, 2022, entitled "Written Warning – Insufficient Performance – Rutherford" regarding Plaintiff's alleged "unacceptable performance" and advised that "additional disciplinary actions will be taken

if your performance does not improve within the next thirty (30) calendar days." (Written Warning attached to Marlow-Grodeman Emails, dated August 3, 2022 (Jacksboro-Open-Records414-416), attached hereto as Exhibit 4).

90. In the Written Warning dated July 15, 2022 (Exh. 4), Commissioner Ralph Davis made numerous falsehoods about the Plaintiff's alleged performance issues and further included a list of 17 items of "Corrective actions" which comprised of the same 12 action items that Commissioner Davis previously raised in the Sanitation Committee meeting on July 6, 2022 (at Exh. 3), plus the following additional 5 items added thereto: "7. Properly Train Employees on equipment operation. … 13. Rope is to be opened in the mornings when the front gate is opened. 14. Obtain quotes for privacy fence. 15. Garage doors are to be replaced. 16. Designate parking for employees." (Written Warning attached to Marlow-Grodeman Emails, dated August 3, 2022 at Exh. 4).

91. On two occasions on and after July 15, 2022, at the instruction of Commissioner Ralph Davis, Commissioner Charles Baird presented the Written Warning (Exh. 4) to Plaintiff in an attempt to have him sign the retaliatory discipline.

92. However, Plaintiff refused to sign off on the Written Warning (Exh. 4) because— in addition to several of the 17 "Corrective actions" being unrealistic as well as the 30 day deadline to complete same—the Board of Commissioners never voted to issue Plaintiff the retaliatory Written Warning.

93. The Board of Commissioners did not vote to issue Plaintiff the retaliatory Written Warning dated July 15, 2022 (at Exh. 4).

94. The Sanitation Committee did not vote to issue Plaintiff the Written Warning dated July 15, 2022 (at Exh. 4).

95.     There is no public record anywhere evidencing that the Board of Commissioners, the Sanitation Committee, or any other elected officials, ever voted to issue Plaintiff the Written Warning dated July 15, 2022 (at Exh. 4).

96.     Commissioners Ralph Davis and Charles Baird, as well as Dewayne Baird and Rusty Orick, did not have the requisite authority to unilaterally issue Plaintiff the Written Warning dated July 15, 2022 (at Exh. 4).

97.     Commissioner Ralph Davis made the decision and/or was involved in the decision-making process to issue Plaintiff the Written Warning dated July 15, 2022 (at Exh. 4).

98.     Commissioner Charles Baird made the decision and/or was involved in the decision-making process to issue Plaintiff the Written Warning dated July 15, 2022 (at Exh. 4).

99.     Commissioner Rusty Orick made the decision and/or was involved in the decision-making process to issue Plaintiff the Written Warning dated July 15, 2022 (at Exh. 4).

100.    Commissioner Dewayne Baird made the decision and/or was involved in the decision-making process to issue Plaintiff the Written Warning dated July 15, 2022 (at Exh. 4).

101.    The decision to issue Plaintiff the Written Warning dated July 15, 2022 (at Exh. 4) was made outside the purview of the public eye in violation of the Tennessee Sunshine Act, Tenn. Code Ann. § 8-44-101, *et seq.*

102.    Despite circumventing the proper channels to get approval to issue the Written Warning to Plaintiff in violation of the Tennessee Sunshine Act, Tenn. Code Ann. § 8-44-101, *et seq.*, on or about August 3, 2022, Commissioner Ralph Davis thereafter instructed for Defendants' employees to place a copy of the Written Warning into Plaintiff's personnel file. (*See* Exh. 4).

103.    While Plaintiff clearly disagreed with the illegitimate and retaliatory Written Warning (Exh. 4), Plaintiff still agreed to complete the 17 "corrective actions" identified therein

because he reported to and was supervised by the Board of Commissioners.

104.    On August 15, 2022, during a Board of Commissioners meeting, Chairman Johnny Bruce read an email sent by Finance Director, Jeff Marlow, describing Plaintiff's "plan of action to accomplish the loading and transportation of trash at the Transfer Station to the landfill," which appeared to be "feasible and fundable," because, at that time, there were issues with waste piling up at the Transfer Station due to the Sanitation Committee's decisions on how the Sanitation Department should be run, contrary to Plaintiff's recommendations due to Plaintiff's position and authority as Sanitation Director becoming increasingly limited by the Board of Commissioners.

105.    One issue, for example, was that the Sanitation Department did not have the ability to correctly load the recently purchased compactors without a backhoe, and Plaintiff therefore recommended on multiple occasions to hold off on installing the new compactors until the backhoes could be purchased. However, the Sanitation Committee ignored Plaintiff's recommendation and ordered that the compactors be installed. As another example, during Plaintiff's employment, he complained on multiple occasions about how the local municipalities, such as the City of LaFollette, were allowed to dump commercial waste for free at the Transfer Station and when Plaintiff tried to put a stop to this and/or at least ensure that the municipalities were charged to help fund the overwhelmed Sanitation Department, the Sanitation Committee disagreed because certain Commissioners, like Scotty Kitts, who was an employee of the City of LaFollette, were against the proposal. As a result, Plaintiff did as he was ordered to do by the Commissioners and continued to accept the commercial waste from the municipalities for free.

106.    Shortly thereafter, on August 18, 2022, a TDEC Environmental Consultant made an unannounced visit to inspect whether the Transfer Station was in compliance with the Tennessee laws and regulations pursuant to the Tennessee Solid Waste Disposal Act, Tenn. Code

Ann. § 68-211-101, *et seq*., and the Tennessee Solid Waste Regulations, Division Code Chapter 0400-11-01, *et seq.*

107.    After this TDEC visit on August 18, 2022, Plaintiff was informed by a TDEC manager that a Board of Commissioner called and requested for TDEC to inspect the Transfer Station around that time.

108.    During the TDEC inspection on August 18, 2022, Plaintiff reported to the TDEC Environmental Consultant the various ongoing violations of Tennessee law occurring due to the Board of Commissioners repeatedly prioritizing commercial interests at the expense of the health, safety, and welfare of the general public, such as the taxpayers, including issues that were not even related to his job as Sanitation Director.

109.    During the TDEC inspection on August 18, 2022, Plaintiff notified the TDEC Environmental Consultant that, with respect to the Transfer Station, stormwater was coming into contact with waste in violation of Tennessee law due to Plaintiff being previously required to build the road to the nearby Animal Shelter that was causing the area not to drain like it was supposed to, the illegal dumping of commercial tires, the illegal acceptance of commercial waste at the Convenience Centers, and burning while using a defective air curtain destructor that did not comply with Tennessee law, and Plaintiff further reported that the issues at the Transfer Station were due in part to a lack of funding by Defendants and he even requested for TDEC to speak directly to the Commissioners about the lack of funding.

110.    At all times material hereto, it was not Plaintiff's job as Sanitation Director to decide how much money should be appropriated to the Sanitation Department, nor was it within the scope of his position to build roadways.

111.    After the TDEC visit on August 18, 2022, and before Plaintiff and several

Commissioners visited the TDEC Field Office on September 8, 2022, Plaintiff informed the Commissioners on the Sanitation Committee that he self-reported all of the above-referenced issues and illegalities to TDEC.

112. As a result of the ongoing retaliation against the Plaintiff, including the Written Warning (Exh. 4) among other issues, Plaintiff also reached out to County Technical Assistance Services and Plaintiff also decided to again reach out to the County Attorney, Joe Coker, due to it being about a year since Plaintiff initially reached out to Coker via email regarding some of the issues with certain Board of Commissioners in June 2021.

113. Accordingly, on August 22, 2022, Plaintiff submitted a formal complaint to the County Attorney, Joe Coker, to complain about the "hostile work environment" Plaintiff and the other employees had been subjected to due to the power struggle between the Board of Commissioners and the Mayor over the Sanitation Department, that certain Commissioners have had discussions in "clear violation of the sunshine act," that Plaintiff actually has "recordings of said conversations," that there has also been sabotage at the facility where Plaintiff works, such as due to keys being stolen, Plaintiff being given unattainable deadlines and set up to fail with respect to the Written Warning's 17 action items, harassing Plaintiff to sign the Written Warning which he refused to do because the 17 action items were "never presented to the full body for a vote." (Plaintiff's Complaint dated August 22, 2022, and Coker's response thereto dated August 24, 2022 (Jacksboro-Open-Records296-298), attached hereto as Exhibit 5).

114. In his August 22, 2022 complaint (Exh. 5), Plaintiff also referenced the previous complaint that he submitted on June 11, 2021 via email to County Attorney, Joe Coker, and copied thereto all of the sitting Campbell County Board of Commissioners at that time. (*See* Plaintiff's Email Complaint to Joe Coker, dated June 11, 2021, at Exh. 1).

115.     However, unlike Plaintiff's prior complaint to County Attorney, Joe Coker, in June 2021 that was ignored, Coker acknowledged Plaintiff's August 22, 2022 complaint by attaching it to an email and copying thereto the Mayor and all of the Board of Commissioners, but instead of Coker responding substantively to Plaintiff's complaint, Coker stated that he requested an opinion from the Tennessee Board of Professional Responsibility and he was advised that he represents Campbell County as an organization, he has an "obligation to report and disclose this letter to the County Commission for any action that the Commission deems appropriate," and Coker further ominously concluded in his response: "If Mr. Rutherford's interests are adverse to those of the county then there is a potential conflict and I cannot represent him and Mr. Rutherford may wish to obtain independent representation." (Plaintiff's Complaint dated August 22, 2022, and Coker's response thereto, at Exh. 5).

116.     After the County Attorney, Joe Coker, sent Plaintiff's August 22, 2022 complaint to the Board of Commissioners (Exh. 5), the Commissioners quit interacting with Plaintiff or even speaking to him, and Plaintiff was otherwise ostracized by the Commissioners.

117.     By this time, as also set forth herein, Defendants had increasingly limited the scope of Plaintiff's role and authority as Sanitation Director, his decision-making was marginalized and diminished to the point that he was not even allowed to hire and fire employees in the Sanitation Department, and he had no control or authority of several key aspects of the Sanitation Department, such as whether the Convenience Centers accepted commercial waste, whether the facilities were open on the weekends without an attendant on site, and whether the commercial waste, like the 700+ tires, should be illegally dumped at the top of the hill at the Transfer Station—all of which was in violation of Tennessee law and Defendants' TDEC Permits, and were decisions made by certain Board of Commissioners due to Plaintiff's decisions being overruled and/or ignored.

118.     On August 24, 2022, Plaintiff also reached out to a reporter for the Volunteer Times to provide the reporter with a copy of his formal complaint that he submitted to County Attorney, Joe Coker (Exh. 5) to bring to light the issues regarding the County that were of public concern.

119.     On August 24, 2022, TDEC sent Defendants (via Plaintiff as Sanitation Director) a letter entitled "Compliance Evaluation Inspection, Notice of Violation" for the Transfer Station, based on the findings from the inspection on August 18, 2022 violating Tennessee law, including the Solid Waste Disposal Act, Tenn. Code Ann. § 68-211-101, *et seq*., and the Tennessee Solid Waste Regulations, Division Code Chapter 0400-11-01, as related to the excessive amounts of waste, and this letter further scheduled a Compliance Review Meeting on September 8, 2022 to discuss the steps to return the Transfer Station into compliance.

120.     Shortly thereafter, on September 8, 2022, Plaintiff and several Board of Commissioners, including Johnny Bruce, Scotty Kitts, Dewayne Gibson, Charles Baird, and Zachary Marlow, attended the Compliance Review Meeting with TDEC personnel at TDEC's Knoxville Environmental Field Office to determine the steps to get the Transfer Station compliant with TDEC's standard and Tennessee law.

121.     During the TDEC meeting on September 8, 2022, Plaintiff told the truth about the lack of funding appropriated to the Sanitation Department to address the issues, lack of staffing, among other issues, and, after this meeting concluded, one of the TDEC managers even commended Plaintiff for telling the truth by "bringing all of the issues to light." Eventually, during this TDEC meeting, the Commissioner Chairman, Johnny Bruce, told the TDEC personnel that the Sanitation Department will have "whatever funding and means" needed at Plaintiff's disposal in order to get the Transfer Station compliant with TDEC's standard and Tennessee law. However, this representation ultimately proved to be untrue, at least during Plaintiff's tenure.

122.    Shortly thereafter, in late-September or early-October 2022, Plaintiff submitted to TDEC and the Board of Commissioners the plan to get the Transfer Station in compliance with Tennessee law, which focused on the primary priority of removing the excessive waste from the Transfer Station to the landfill, but the Plaintiff was instructed by the Commissioners to continue accepting commercial and residential waste while this cleanup was taking place. (Plaintiff's corrective plan submitted to TDEC (TDEC-153-154), attached hereto as Exhibit 6).

123.    The Commissioners on the Sanitation Committee did not object to or disagree with Plaintiff's corrective action plan for the Transfer Station that was submitted to TDEC (at Exh. 6).

124.    About a month prior, in August 2022, Defendants' elections resulted in changes to multiple positions throughout the Campbell County Government, including most notably, the newly elected Mayor, Jack Lynch, the newly elected Commissioners, David Adkins, Michael Douglas, and Dewayne Kitts, and also the re-elected Commissioners, Dwayne Baird, Charles Baird, and Rusty Orick.

125.    As the Commissioners began to take office after the elections, on September 6, 2022, the Board of Commissioners voted to approve the new members of the Sanitation Committee: recently elected David Adkins to serve as the Chairman of the Committee, with the new committee members, Michael Douglas, Derrick Sharp, Dwayne Gibson, Dwayne Baird, and Scotty Kitts.

126.    During the following Sanitation Committee meeting on September 13, 2022, Commissioner, David Adkins, was elected as the Chairman of the Sanitation Committee, and Commissioner, Charles Baird, was elected as the Vice Chairman.

127.    During the September 13, 202 Sanitation Committee meeting, those present discussed the prior TDEC meeting on September 8, that it had recently been "discovered" there was actually "60+ tons coming to the facility per day," and that Plaintiff believed the Transfer

Station could get compliant with TDEC's requested standard within 60 days provided that he was given the staff and support to do so.

128.     The Transfer Station in fact became compliant with TDEC's requested standard within 60 days of the Sanitation Committee meeting on September 13, 2022.

129.     During the Sanitation Committee meeting on September 13, 2022, the Committee specifically discussed several of the illegal issues that Plaintiff had been consistently complaining about with respect to the Transfer Station, including, among other issues, the illegal dumping of commercial waste, the violations of Defendants' TDEC Permits since the Convenience Centers only allowed the dumping of "soft bagged household generated waste" but the municipalities, such as the City of LaFollette, were dumping commercial waste in violation of the TDEC Permits, that the Commissioners allowed citizens to dump over the weekends with no attendant on duty which is also in violation of the TDEC Permits due to citizens complaining about not being allowed to dump over the weekends.

130.     As the Sanitation Director, Plaintiff could be subjected to civil penalties and/or fines under Tennessee law due to the ongoing issues at Defendants' waste facilities and violations of the respective TDEC Permits.

131.     The following day, September 14, 2022, the Plaintiff began experiencing symptoms of a possible heart attack and, as a result, Plaintiff was taken by ambulance from the Sanitation Department to the hospital and stayed in the hospital for three (3) days and then, the following week, Plaintiff went back to the hospital for another two (2) days due to having the same symptoms.

132.     While Plaintiff was in the hospital, on September 15, 2022, the Board of Commissioners held a Sanitation Committee meeting, and the Chairman of the Board of Commissioners, Johnny Bruce, concluded from his review of the monthly tonnage reports that,

beginning in August 2022, the Transfer Station was receiving 1,190 tons per month and exporting 745 tons per month, and this created a stock pile of waste at the facility. As a result, in the attempt to clean up the Transfer Station, the Sanitation Committee passed budget resolutions for the purchase of two open top chip trailers not to exceed $80,000 and two additional trailers to haul away trash, and also a motion to seek funding for a potential Assistant Mechanic.

133.    Because Plaintiff could not attend the Sanitation Committee meeting on September 15, 2022 while he was hospitalized, Plaintiff was not involved in any of the purchasing decisions that were made during said meeting despite him supposedly being the Director of Sanitation, further diminishing the scope and authority of Plaintiff's position.

134.    That same day, Defendants received TDEC's anticipated enforcement letter, dated September 15, 2022, referencing the prior Compliance Review Meeting on September 8, 2022 and the discussions during said meeting including with respect to the ongoing violations of Tennessee law, Tenn. Code Ann. § 68-211-101, *et seq.*, and Rule 0400-11-01.02, *et seq.*

135.    Plaintiff was blamed for TDEC's issuance of the enforcement letter, dated September 15, 2022, due to his whistleblowing and First Amendment protected activities.

136.    On September 19, 2022, the Board of Commissioners passed a resolution to amend the budget for the Sanitation Department and increase the budget for "Other Contracted Services" and "Rentals" from $8,280.00 to a total of $133,280.00.

137.    On September 22, 2022, the Sanitation Committee held another meeting regarding the status of the cleanup of the Transfer Station, which began with Plaintiff's update as to the tonnage numbers from September 1 to September 22, 2022, the Transfer Station received a total of 841.25 tons, exported a total of 979.86 tons, the compactor exports were a total of 115.40 tons, and Plaintiff estimated there was still approximately 300 tons remaining. (Minutes for Sanitation

Committee meeting dated September 22, 2022 (Jacksboro-Open-Record-539-543), attached hereto as Exhibit 7).

138.    During the Sanitation Committee meeting on September 22, 2022, Plaintiff complained that his "hands are tied at running this facility" because of how certain Board of Commissioners have restricted the scope of his authority and job as Sanitation Director. For example, Plaintiff even requested for the new Deputy Sanitation Director position to be created in order to assist Plaintiff within the Department, and Plaintiff explained that he would hire someone right now if it was his decision. In response, the Committee asserted it was "not attempting to prohibit the hire at this time" and that it was "only making a suggestion" that Plaintiff should hold off on hiring someone for the position and even passed a motion to "request that Rutherford consider waiting to hire a deputy director for a minimum of 30 days." (Minutes for Sanitation Committee meeting dated September 22, 2022, at Exh. 7).

139.    In response, one of the Commissioners on the Sanitation Committee, Mike Douglas, mentioned that Plaintiff previously complained to TDEC about his timeline for how quickly Plaintiff stated to TDEC that he would have cleaned up the Transfer Station, but-for the lack of equipment and drivers that was being provided to the Sanitation Department. (Minutes for Sanitation Committee meeting dated September 22, 2022, at Exh. 7).

140.    On October 3, 2022, the Sanitation Committee held another meeting regarding the status of cleaning up the Transfer Station and the ways to increase removal. Commissioner Adkins opined that if the amount of waste removed was not increased, then the facility would not meet the deadline to be cleaned up to TDEC's standard. As a result, the Committee passed a motion to evacuate a minimum of 9 loads per day from the Transfer Station and solicit haulers to haul the waste out.

141. During the Sanitation Committee meeting on October 3, 2022, Plaintiff reported that commercial waste was still being illegally dumped at the Transfer Station on the weekends when there being no operator or scalehouse attendant present, which continued to violate Defendants' TDEC Permit and Tennessee law, as well as Board of Commissioners' own resolution that had been in effect for years.

142. In fact, due to Plaintiff's complaints about these violations of Tennessee law during the October 3, 2022 Sanitation Committee meeting, Chairman Johnny Bruce even suggested installing cameras at the top of the hill and prosecution for those who illegally dump.

143. During the Sanitation Committee meeting on November 7, 2022, Plaintiff again complained that several businesses were illegally dumping commercial waste at one of the Convenience Centers (Oswego) but were not paying Defendants as commercial customers and also that the Oswego center was not even permitted to accept commercial waste pursuant to its TDEC Permit in violation of Tennessee law. Plaintiff specifically asked for the Committee for advice on this issue, but the only "advice" given was that the businesses are not permitted to dump at the Oswego center and Plaintiff's request for advice was otherwise ignored and dismissed.

144. During the following Sanitation Committee meeting on November 14, 2022, Plaintiff objected to Commissioner Michael Douglas' proposal of installing Class IV containers for large bulky items, including commercial waste, at each of the Convenience Centers because, again, Tennessee law and Defendants' TDEC Permits for the Convenience Centers only allowed for residential household generated soft bag waste—not commercial waste. (Minutes for Sanitation Committee meeting dated November 14, 2022 (Jacksboro-Open-Records-558-561), attached hereto as Exhibit 8).

145. However, during the November 14, 2022 meeting, Plaintiff further reported there

were Class IV containers for large bulky items, including commercial waste, at the Oswego and White Oak Convenience Centers because at some point Commissioners "instructed" for these containers to be placed there. In response, Commissioner Michael Douglas "posed the question of why the attendants would allow the dumping of such if the facility was not permitted to do so." In response, Plaintiff referenced "1 of 15" Commissioners allowing the illegal dumping of certain waste at the Oswego and White Oak Convenience Centers which was in reference to the current and/or former Commissioners, Ralph Davis (who was effectively replaced by Commissioner Michael Douglas) and Scotty Kitts, because those are the Commissioners over the areas where these centers were located. (Minutes for Sanitation Committee meeting dated November 14, 2022, at Exh. 8).

146.    During the November 14, 2022 meeting, Plaintiff also objected to Commissioner Adkins' proposal of contracting with third parties to weigh the commercial waste going into the Oswego Convenience Center because, again, it would violate Tennessee law due to the Permit only allowing for residential household generated soft bag waste and "if commercial waste is to be accepted at this center then it will need to be re-permitted to a transfer station." (Minutes for Sanitation Committee meeting dated November 14, 2022, at Exh. 8).

147.    In response to Plaintiff's complaint, Commissioner David Adkins got upset and stated that he would review the definition of commercial waste under Tennessee law because the "small businesses in Jellico deserve the same services as those on this side of the mountain without having to drive 30 miles or 45min-hr" to which Plaintiff again explained that to do so would require re-permitting Defendants' TDEC Permits to accept commercial waste at the Convenience Centers. As a result, the Sanitation Committee discussed various ways to still allow for commercial waste to be dumped at the Convenience Centers, like Oswego, that were not permitted to accept

commercial waste under Tennessee law. (Minutes for Sanitation Committee meeting dated November 14, 2022, at Exh. 8).

148.    During Plaintiff's employment, in addition to reporting the illegal conduct described herein, Plaintiff made numerous similar reports directly to the Tennessee Comptroller related to these illegal activities, including reporting Commissioner Scotty Kitts' brother for dumping commercial trash without registering as a commercial hauler to avoid paying required dumping fees; the Administrator of the City of LaFollette, Stan Foust, using municipal equipment and municipal employees while on the clock to dispose of Foust's personal waste tires; Commissioner(s) authorizing illegal dumping of commercial waste; the same issues that Plaintiff reported to TDEC personnel on August 18, 2022; and also that one of Defendants' employees, a secretary, was using the Defendants' equipment while on the clock to create electioneer campaign cards for a candidate running for a seat on the Board of Commissioners.

149.    As a result of Defendants' illegal activities during Plaintiff's employment, Plaintiff refused to engage in further illegal activities by signing misleading and/or inaccurate Annual Progress Reports ("APR") that were submitted to TDEC under penalty of perjury as required by Tennessee law, the Solid Waste Management Act, Tenn. Code Ann. § 68-211-801, *et seq*., due to municipalities falsely inflating the total amount (weight) of the recyclables in order to receive a higher reimbursement from the Federal Government, which were then included in Defendants' APR reports, thereby making said reports false. Due to Plaintiff's refusal to sign the APR reports, the Chairman of the Board of Commissioners ultimately signed said reports.

150.    On November 21, 2022, the Sanitation Committee Commissioners, Charles Baird, Scotty Kitts, Dewayne Baird, Michael Douglas, and David Adkins, all "voted" to demote Plaintiff from the Director of the Sanitation Department "with job title to be determined by the new

Sanitation Director with the pay scale to be reflective of the title." (Minutes for Sanitation Committee dated November 21, 2022 (Jacksboro-Open-Records0562-564), attached hereto as Exhibit 9).

151.     The decision to demote Plaintiff was made before the Sanitation Committee meeting on November 21, 2022.

152.     Before voting to demote Plaintiff, the Sanitation Committee mentioned the following six (6) "concerns" with respect to the Sanitation Department: (1) Well Springs Convenience Center closed early on November 20, 2022 because the center was full: "Adkins stated that the director should know the amount of waste entering the facility daily to know the rotation schedule for the compactors. Adkins also stated that closing the facility to prevent regulation violations is understandable however this should not be a frequent occurrence, maybe 1-2 times per year." (2) Number of drivers employed by Defendant: "Baird's point is that with three drivers that are not in tractor trailers moving to the landfill but are (should be) concentrating on hauling compactor boxes. The rotation issues should have been well addressed by now." (3) "Baird's next point was that of a maintenance truck sitting in front of the building for over a week and should have need aired up and moved behind the building." (4) Baird "also pointed out a motion that was made in the October 3rd to clean the compactor sites once weekly and that is still not being done." (5) "Additionally, there was a motion made for additional contractor but that has not been done." (6) "Baird notes that it has taken seven (7) years to build the undesignated fund balance for sanitation to use 1/3rd of that in the first quarter." (Minutes for Sanitation Committee dated November 21, 2022, at Exh. 9).

153.     Later that day, November 21, 2022, the Board of Commissioners held a meeting to formally approve the Sanitation Committee's decision to demote the Plaintiff.

154. During that same meeting on November 21, 2022, the Board of Commissioners voted to give back to the Mayor oversight of the Sanitation Department, thereby taking it away from the County Commission, and then the Mayor, Jack Lynch, nominated for Commissioner David Adkins to be the Interim Director of Sanitation to replace Plaintiff.

155. On November 21, 2022, the Board of Commissioners also formally amended the resolution to give back to the Mayor the "hiring, termination, and supervision of the Director of Environmental Services & Sanitation" and that this position is "supervised only by the Campbell County Mayor" and, further, "shall be subject to removal at the sole discretion of the County Mayor without necessity of approval by the Board of County Commissioners of Campbell County." (Amended Resolution No. 2022-11-21-5 of the Board of Commissioners (Jacksboro-Open-Records328-332), attached hereto as Exhibit 10).

156. As a result, Defendants no longer required the Sanitation Director to report to and be supervised by as many as 15 different Board of Commissioners, but instead only report to and be supervised by the highest elected official in Campbell County, TN, the County Mayor.

157. Defendants did not notify Plaintiff of his demotion.

158. Due to the serious medical conditions associated with his heart attack symptoms, on November 22, 2022, Plaintiff requested for FMLA leave pursuant to 29 U.S.C. § 2601, *et seq*., and for Defendants to provide him with the relevant paperwork in order to initiate FMLA leave, and the FMLA paperwork was provided to Plaintiff that same day.

159. However, Plaintiff was abruptly fired as hereinafter alleged before he could submit the formal FMLA paperwork to the Defendants.

160. Plaintiff was out of work sick on November 22-23, 2022 due to the serious medical conditions associated with his heart attack symptoms, and then all of Defendants' employees were

out of work due to the Thanksgiving holiday on November 24-25, 2022.

161.    Prior to Plaintiff's termination, Defendants were aware of and/or knew that Plaintiff had to miss work due to his heart attack related symptoms and that Plaintiff requested FMLA leave on or about November 22, 2022.

162.    Plaintiff returned to work on Monday, November 28, 2022, and discovered that his office in the Sanitation Department was cleaned out, and, shortly thereafter, his own employees advised that he had been demoted from the Sanitation Director position.

163.    The following day, on November 29, 2022, Plaintiff was given a letter from the "Interim" Director of the Sanitation Department, David Adkins, notifying Plaintiff that his employment has been terminated effective immediately. (Termination letter dated November 29, 2022, attached hereto as Exhibit 11).

164.    Plaintiff was never given a reason for his termination.

165.    After his termination, Plaintiff was immediately replaced by David Adkins.

166.    The Board of Commissioners on the Sanitation Committee made the decision and/or were involved in the decision-making process to demote and then terminate Plaintiff.

167.    In demoting and then terminating Plaintiff, the Board of Commissioners on the Sanitation Committee were acting under color of the law pursuant to their respective governmental duties and powers, and there was no further appeal of the demotion and termination decisions.

168.    In demoting and then terminating Plaintiff, the Board of Commissioners on the Sanitation Committee intentionally deprived Plaintiff of his constitutional rights of which he, and objectively reasonable persons in his position, would have known and such condition was unreasonable in light of those clearly established rights.

169.    In demoting and then terminating Plaintiff, the Board of Commissioners on the

Sanitation Committee acted pursuant to official policies of Defendants in that they had final policy-making authority with respect to Plaintiff's demotion and termination.

170. The decisions to demote and terminate Plaintiff were unreviewable.

171. Plaintiff was demoted and terminated for a trumped-up reason, and the real reason for his demotion and termination violates both Federal and Tennessee law, constitutes a violation of public policy and a violation of Tenn. Code Ann. § 50-1-304, as well as violations of the FMLA, 29 U.S.C. § 2601, *et seq*., and, as such, Plaintiff sues for wrongful discharge.

172. Defendants are responsible and liable for the retaliatory actions of their agents and employees under the doctrine of respondent superior and under agency principles, and Defendants are responsible and liable because the decision-maker(s) to Plaintiff's demotion and termination had final policy-making authority with respect to the demotion and termination decision.

173. This suit is timely filed.

174. As a result of Defendants' conduct, the Plaintiff has sustained, and will sustain, great emotional distress, humiliation, embarrassment, emotional distress and anxiety, inconvenience, damage to his professional reputation and standing in the community, and loss of enjoyment of life. Plaintiff has lost tangible job benefits, including a loss of income and other privileges and benefits of employment, both past and future.

## COUNT I – 42 U.S.C. § 1983 / First Amendment Retaliation

175. The foregoing allegations are incorporated herein by reference to same.

176. Defendants deprived Plaintiff of the rights secured by the United States Constitution while acting under color of state law.

177. Plaintiff engaged in constitutionally protected speech activity on matters of public concern and his interest in such activity outweighs the Defendants' interest in promoting the

efficiency of the public service it provides as an employer.

178. Plaintiff's speech activity did not disrupt the workplace and Defendants have no legitimate competing interest in prohibiting it for the Court to balance.

179. Plaintiff suffered adverse employment actions as described above that would chill an ordinary person in the exercise of his constitutional rights.

180. Plaintiff's speech activity was a substantial or motivating factor in the adverse employment actions he suffered, in violation of 42 U.S.C. § 1983 and the First Amendment of the United States Constitution.

181. Defendants' conduct was undertaken with malice or reckless indifference to Plaintiff's federally protected rights.

### COUNT II – Family and Medical Leave Act, 29 U.S.C. 2601, *et seq.*

182. The foregoing allegations are incorporated herein by reference to same.

183. Defendants terminated Plaintiff's employment, in part, in retaliation for exercising his rights to FMLA and/or in order to interfere with his right to FMLA leave, and he hereby sues the Defendants for violating the FMLA, 29 U.S.C. § 2601, *et seq*.

184. As a result of Defendants' conduct, the Plaintiff sustained a loss of income and benefits, both past and future, and other pecuniary losses.

185. The conduct of Defendants was willful in nature and sufficient to justify the imposition of liquidated damages.

### COUNT III – Public Protection Act, Tenn. Code Ann. § 50-1-304

186. The foregoing allegations are incorporated herein by reference to same.

187. Defendants demoted and then terminated Plaintiff's employment because he exercised his constitutional and statutory rights and refused to remain silent about or participate in

conduct that violated, or that he reasonably believed violated the laws, regulations, codes and ordinances intended to protect the public health, safety, and welfare.

188.     Defendants demoted and terminated Plaintiff's employment in violation of public policy and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

189.     Defendants' conduct was intentional, reckless, malicious, and/or fraudulent.

### COUNT IV – Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-601, *et seq*.

190.     The foregoing allegations are incorporated herein by reference to same.

191.     Additionally and/or in the alternative, Plaintiff made numerous reports of illegal and unethical conduct that he reasonably believed violated the laws, regulations, codes and ordinances intended to protect the public health, safety, and welfare, to multiple elected officials within the Campbell County Government, including the County Mayor and the Board of Commissioners.

192.     Ultimately, however, Plaintiff was demoted on November 21, 2022 and then terminated on November 28, 2022 for trumped-up reasons.

193.     Therefore, as an additional cause of action and/or in the alternative to the other claims set forth herein, Plaintiff was wrongfully disciplined, threatened with discipline, demoted, terminated, and otherwise discriminated against for exercising his right to communicate with elected public officials in violation of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-603.

194.     Thus, Plaintiff is entitled to the following relief provided by the anti-discrimination/retaliation provision of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-603, including treble damages, plus reasonable attorneys' fees.

195.     As set forth above, Defendants' conduct harmed and caused damages to Plaintiff

as alleged herein.

**WHEREFORE**, Plaintiff prays for the following relief:

1. Compensatory damages, including back pay and front pay, (or, in the alternative, reinstatement, if the Court deems it appropriate).

2. Treble damages.

3. Liquidated damages.

4. Appropriate punitive damages.

5. Prejudgment interest.

6. Reasonable attorneys' fees.

7. The costs of this action.

8. A jury to try this cause.

9. Appropriate injunctive relief ordering Defendants to cease and desist from engaging in discriminatory and retaliatory acts, illegal and unethical conduct as public officials, and to undergo training as appropriate.

RESPECTFULLY SUBMITTED this 21st day of November 2023.

*s/D. Alexander Burkhalter, III*
David A. Burkhalter, II, TN BPR #004771
D. Alexander Burkhalter, III, TN BPR #033642
Zachary J. Burkhalter, TN BPR #035956
Attorneys for Plaintiff
111 South Central Street
P.O. Box 2777
Knoxville, Tennessee 37901
(865) 524-4974